# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **CALIFORNIA**

**FILED**

MAY 0 6 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

DONALD MOORE

**CRIMINAL COMPLAINT**

CASE NUMBER:

2:08 - MJ - 0167   GGH

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief.  On or about **2-29-08 and 3-5-08** in **San Joaquin** County, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ **Knowingly and intentionally conspire to distribute and knowingly and intentionally distributed 3,4-methylenedioxy-methamphetamine (MDMA), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine**

in violation of Title **21**, United States Code, Section(s) **841(a)(1) and 846**.  I further state that I am a(n) DEA Special Agent and that this complaint is based on the following facts:

▸ **See Attached Affidavit**

Continued on the attached sheet and made a part of this complaint:    **X**

_Brittany Ziesman-Hicks_  5-2-08

Signature of Complainant  Brittany Ziesman-Hicks

DEA

Sworn to before me, and signed in my presence

May 2, 2008                           at   Sacramento, CA

| Date | City | State |

Gregory G. Hollows
U.S. Magistrate Judge

**GREGORY G. HOLLOWS**

| Name of Judge | Title of Judge | Signature of Judicial Judge |

### Affidavit of Brittany E. Ziesman-Hicks in Support of Search Warrants, Criminal Complaints, and Arrest Warrants

I, Brittany Ziesman-Hicks, being duly sworn on oath, depose and say:

### BACKGROUND AND EXPERTISE

1. I am a Special Agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 2004. Prior to being employed with DEA, I attended Sam Houston State University and received a Bachelor of Science Degree in Criminal Justice. In 2003, upon graduating from Sam Houston State University, I attended the Federal Law Enforcement Training Center in Artesia, New Mexico. After successfully graduating from the Federal Law Enforcement Training Center, I attended the James J. Rowley Secret Service training academy and graduated as a Uniformed Division Secret Service officer. In 2005, I graduated from the DEA Basic Agent's Academy at the FBI Academy at Quantico, Virginia. I have been assigned to the Sacramento Division Office since June 2005.

2. I have received formal training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques, drug identification, and asset identification from the Drug Enforcement Administration (DEA) academy. In addition, I completed a course entitled: "Drug Use and Abuse" in 2001. I have also spoken at length to more experienced DEA special agents, task force officers, other law enforcement officers, and persons involved in the trafficking of narcotics.

3. The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. The following is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but are the facts which I believe support a finding of probable cause for the complaints, arrest warrants, and search warrants requested.

### Scope of Requested Arrest Warrants, Search Warrants and Criminal Complaints

4. Based upon the information described in this Affidavit, your affiant respectfully requests that this Court issue criminal complaints and arrest warrants for the following individuals:

   **Shatoya AUSTIN** for conspiracy to distribute and the distribution of at least 5 grams of cocaine base on or about January 15, 2008 and January 30, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846; and for conspiracy to distribute and the distribution of 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine, on or about February 29, 2008 in violation of 21 U.S.C. § 841(a)(1) and 846.

**Ralph DIXON** for conspiracy to distribute and the distribution of at least 5 grams of cocaine base on or about January 15, 2008, January 30, 2008, and March 7, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846.

**Donald MOORE** for conspiracy to distribute and the distribution of 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine, on or about February 29, 2008, and March 5, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846.

**Rafael Vasquez-GALVAN** for conspiracy to distribute and the distribution of at least 5 grams of cocaine base on or about May 2, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846.

5. Based upon the information described below, this Affidavit also requests authority to search for evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, **Ralph DIXON's** distribution of cocaine base and conspiracy to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 846 located at **1025 Rosemarie Ln. #I7, Stockton, California, one silver-colored 2000 Chevrolet Cavalier, CA license #4KAX727; one yellow 1970 Mercury Cougar, CA license plate # 2MXE629,** all further described in **Attachment A-1,** attached hereto and incorporated by reference herein.

6. Based upon the information described below, this Affidavit also requests authority to search for evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, **Donald MOORE's** distribution of 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine, in violation of 21 U.S.C. § 841(a)(1) and 846 located at **9429 Westmora Ct., Stockton, California, one silver-colored 1998 Lexus, CA license #5UPB377; and one silver 2000 Ford Taurus, CA license #4GVT728,** all further described in **Attachment A-2,** attached hereto and incorporated by reference herein.

7. Therefore, this Affidavit requests permission to search all the properties and persons set forth in Attachments A-1 and A-2 to this Affidavit and seize the items listed and incorporated in Attachment B to this Affidavit.

## Use of DEA Confidential Source

8. In December 2007, law enforcement officers used the services of a DEA Confidential Source, hereafter referred to as a CS, in this investigation. On June 30, 2006, the CS was arrested for violation of Title 21 U.S.C. § 841 (a)(1) – Distribution of a Controlled Substance (methamphetamine). The CS pled guilty in the Eastern District of California to the above listed offense and cooperated with law enforcement for consideration on his/her pending sentence. A check of the CS's criminal history revealed that the only offense listed is the above mentioned offense. The CS is

currently out of custody and is assisting law enforcement in this and other criminal investigations. The disposition of the above listed offense is currently pending.

9. To the best of my knowledge, the information provided by the CS about drug trafficking activities related to this investigation have been truthful, accurate, and corroborated through the investigation.

### January 15, 2008 – Purchase of cocaine base from AUSTIN and DIXON

10. On January 15, 2008, SPD Officer Fritts and SPD Officer Mamaril met with the CS in anticipation of making a controlled purchase of cocaine base from AUSTIN in Stockton, California. Prior to the transaction, the CS and his/her vehicle were searched for narcotics and contraband with negative results. The CS was given a predetermined amount of U.S. currency and an audio monitoring devise which allowed SPD Officers to record the subsequent conversation and transaction with AUSTIN and DIXON, who was subsequently identified as the source of supply for the cocaine base.

11. At approximately 11:58 A.M., the CS contacted AUSTIN via cell phone in an attempt to purchase a sample of cocaine base from AUSTIN. During the phone call, the CS asked AUSTIN if she was going to be able to "hook up" with the CS today. AUSTIN informed the CS that she would be able to meet and informed the CS to call AUSTIN when the CS was in town.

12. At approximately 12:15 P.M., the CS contacted AUSTIN via cell phone and AUSTIN informed the CS that she was not dressed and instructed the CS to come to AUSTIN's house. AUSTIN proceeded to give the CS directions to her residence on Brush Creek Dr., Stockton, CA.

13. At approximately 12:17 P.M., SPD Officer Fritts and SPD Officer Mamaril followed the CS to AUSTIN's residence on Brush Creek Dr., Stockton, CA. Once the CS arrived near Brush Creek Dr., the CS placed a phone call to AUSTIN in an attempt to obtain further directions. During the conversation, AUSTIN advised the CS that he/she had just passed AUSTIN's residence. AUSTIN informed the CS that she was going to call her guy, advising that he was right around the corner.

14. At approximately 12:22 P.M., SPD Officer Cole observed the CS park directly in front of a duplex located at 5755 and 5757 Brush Creek Dr., Stockton, CA. SPD Officer Cole observed a black female, subsequently identified as AUSTIN, standing in the driveway of the residence. Upon the CS parking his/her vehicle, AUSTIN got into the front passenger seat of the CS's vehicle.

15. At approximately 12:46 P.M., a silver-colored 2007 Chevy Monte Carlo, CA license # 5WCE017, registered to Danielle HARRELL, parked directly behind the CS's vehicle. A black male from the front passenger seat, exited the vehicle, walked over to the CS's vehicle, and sat in the rear passenger seat of the CS's vehicle. The CS, AUSTIN, and the black male, subsequently identified as Ralph DIXON, began talking. Over the wire, the CS could be heard questioning the price, which AUSTIN advised was $325. The CS was also heard counting out the money. Approximately three minutes later,

AUSTIN and DIXON exited the CS's vehicle and the CS drove away followed by SPD Officer Mamaril and SPD Officer Fritts.

16. At this time, SPD Officer Mamaril and SPD Officer Fritts followed the CS as to the transaction. The CS turned over a clear plastic baggie containing a white substance suspected to be cocaine base and $75. SPD Officer Mamaril and SPD Officer Fritts again searched the CS and the CS's vehicle for contraband and/or money with negative results.

17. During the debriefing, the CS stated that he/she arrived at AUSTIN's residence and called AUSTIN. The CS stated that he/she asked AUSTIN to sit in the CS's vehicle while they waited for AUSTIN's guy to come over with the cocaine base. The CS stated that once AUSTIN's guy arrived, DIXON got out of the silver car and got into the back seat of the CS's vehicle. The CS stated that DIXON handed AUSTIN a plastic bindle/baggie. AUSTIN in turn gave the CS the baggie of cocaine base. The CS stated that he/she counted the money and gave it to AUSTIN.

18. The DEA Western Regional Lab (WRL) later tested the substance purchased from AUSTIN and DIXON on January 15, 2008. The WRL analysis indicated that the substance purchased from AUSTIN and DIXON was cocaine base, 46.4% purity, with the amount of actual (pure) drug weighing 6.2 grams.

### January 30, 2008 – Purchase of cocaine base from AUSTIN and DIXON

19. On January 30, 2008, SPD Officer Fritts and I met with the CS in anticipation of making a controlled purchase of cocaine base from AUSTIN in Stockton, California. Prior to the transaction, the CS and his/her vehicle were searched for narcotics and contraband with negative results. The CS was given a predetermined amount of U.S. currency and was given a transmitter/recorder which allowed agents to record the subsequent conversation and transaction with AUSTIN.

20. The CS contacted AUSTIN at 702-917-8662 to arrange the purchase of approximately two ounces of cocaine base. In a series of recorded phone calls, the CS informed AUSTIN that he/she wanted to get "two zips of cream" and asked AUSTIN if she was "ready." AUSTIN acknowledged and told the CS that she had to call "dude" and have "him" bring it to AUSTIN.

21. Shortly thereafter, the CS received an incoming call from AUSTIN at 209-817-7900. AUSTIN asked the CS if he/she could pick AUSTIN up and they could go and meet "him," meaning the source of supply. AUSTIN also informed the CS to call when once the CS arrived.

22. At approximately 12:37 P.M., SA Taylor observed a silver Chevrolet vehicle, subsequently identified as a 2000 Chevrolet Cavalier, CA license #4KAX727, arrive in the driveway of 5757 Brush Creek Dr., Stockton, CA. The driver, subsequently identified as DIXON, was the only occupant of the vehicle. The driver exited the vehicle and walked towards the front door area of 5757 Brush Creek Dr. Approximately one minute later, SA Taylor observed an individual matching the

physical description of DIXON, walk from the front door area of 5757 Brush Creek Dr., get back into the vehicle, and drive away.

23. SPD Officer Mercado followed the vehicle and obtained the CA license number of #4KAX727. SPD Officer Mercado observed the driver of the vehicle. SPD Officer Fritts subsequently showed SPD Officer Mercado a color photograph of DIXON. SPD Officer Mercado advised that the subject driving the 2000 Chevrolet Cavalier, CA license #4KAX727, was wearing a hat and sun glasses; however, despite the sun glasses and hat, SPD Officer Mercado believed the subject driving the vehicle was DIXON.

24. At approximately 12:45 P.M., the CS arrived and parked in front of AUSTIN's residence. Upon arriving, the CS placed another phone call to AUSTIN and informed AUSTIN that he/she was parked out front. Shortly thereafter, SA Taylor observed a subject, subsequently identified by the CS as AUSTIN, walk from the front door area of 5757 Brush Creek Dr., Stockton, CA and make contact at the passenger side of the CS's vehicle. AUSTIN then sat in the front passenger seat of the CS's vehicle.

25. SPD Officer Fritts and I monitored the transmitter/recorder and heard the CS talking with AUSTIN. SPD Officer Fritts heard the CS inform AUSTIN that they (AUSTIN and the CS) could just wait where they were for AUSTIN's "guy" to arrive. AUSTIN informed the CS that there was no need because she (AUSTIN) already had the two ounces. While listening to the wire, SPD Officer Fritts could hear the CS and AUSTIN discuss the quality of the cocaine base and discuss future transactions of ecstasy.

26. At approximately 12:49 P.M., SA Taylor observed the front passenger door open and observed AUSTIN exit the CS's vehicle. The CS departed the residence and AUSTIN was observed walking towards the front door area of 5757 Brush Creek Dr., Stockton, CA.

27. At this time, SPD Fritts and I followed the CS out of the area and debriefed the CS. The CS turned over a clear plastic baggie containing an off-white substance suspected to be cocaine base. SPD Fritts and I again searched the CS and the CS's vehicle for contraband and/or money with negative results.

28. During the debriefing, the CS stated that he/she arrived at AUSTIN's residence and AUSTIN walked out of her residence. The CS stated that AUSTIN got into the CS's vehicle. AUSTIN then reached into her pocket and informed the CS that "it" was 56 grams. The CS stated that he/she then gave AUSTIN $1300 and AUSTIN counted the money.

29. The CS then asked AUSTIN about ecstasy pills. AUSTIN informed the CS that she could get the CS a boat (1000 pills) for $3.00 a pill.

30. Subsequent to the deal, SPD Officer Fritts completed a records check and found that on December 13, 2007, Ralph DIXON was cited for speeding while driving the listed 2000 Chevrolet Cavalier, CA license #4KAX727. A records check also showed that

the vehicle is registered to Rachel Pearl STALLWORTH, 1025 Rosemarie Lane #I7, Stockton, CA.

31. SPD Officer Cole and SPD Officer Fritts then drove by 1025 Rosemarie Lane, Stockton, CA. SPD Officer Fritts observed a yellow 1970 Mercury Cougar, CA license plate # 2MXE629, parked in a stall near the building. SPD Officer Fritts completed a record check on the vehicle and found the vehicle is registered to Dwayne Ralph DIXON.

32. On January 31, 2008, SPD Officer Mamaril and SPD Officer Fritts drove to 1025 Rosemarie Lane, Stockton, CA. SPD Officer Mamaril and SPD Officer Fritts drove to the back of the complex. The 2000 Chevy Cavalier, CA license #4KAKX727, which was seen departing AUSTIN's residence the previous day prior to the deal, was parked near the building.

33. The DEA Western Regional Lab (WRL) later tested the substance purchased from AUSTIN on January 30, 2008. The WRL analysis indicated that the substance purchased from AUSTIN was cocaine base, 50.5% purity, with the amount of actual (pure) drug weighing 23.9 grams.

### February 19, 2008 – Attempted Purchase of Ecstasy from AUSTIN

34. On February 19, 2008, SPD Officer Fritts and I met with the CS in anticipation of making a controlled purchase of 1000 ecstasy pills from AUSTIN in Stockton, California.

35. At approximately 1:15 P.M., the CS contacted AUSTIN at 702-917-8662 in an attempt to purchase 1000 ecstasy pills from AUSTIN. The CS asked AUSTIN if AUSTIN would be able to "hook that up" for the CS. AUSTIN informed the CS that she would call her guy and call the CS back.

36. At approximately 1:21 P.M., the CS received an incoming telephone call from AUSTIN. The CS questioned AUSTIN on the price of the ecstasy pills to confirm that he/she would still be able to purchase a boot (1000 pills) for $3 a pill. AUSTIN informed the CS that it would be $4 a pill. The CS reminded AUSTIN that during prior conversations, AUSTIN quoted the CS $3 a pill. AUSTIN informed the CS that she gets 1000 pills for $3 a pill, but that was her price.

37. At approximately 1:28 P.M., the CS received an incoming telephone call from AUSTIN. During this phone conversation, the CS informed AUSTIN that the CS had $3,000. The CS asked AUSTIN if her guy would "front" the rest. AUSTIN informed the CS that she did not think her guy would "front" that much. AUSTIN stated that she would call her guy and ask. Approximately seven minutes later, the CS contacted AUSTIN. AUSTIN informed the CS to call AUSTIN's "guy" and discuss the purchase with him. AUSTIN then gave the CS a phone number of 209-594-3424. AUSTIN informed the CS that her guy's name was "Moe," who was subsequently identified as Donald MOORE. AUSTIN then informed the CS that she would give the CS the number to her "cream" (cocaine base) source. AUSTIN gave the CS phone

number 209-423-7157. AUSTIN stated that her "cream" source's name was "Ralph," who was identified as Ralph DIXON.

38. At approximately 1:44 P.M., the CS placed a recorded phone call to MOORE at phone number 209-594-3424. After a few rings, a male voice answered the phone. The CS talked with the subject and asked if his name was "Moe." The subject acknowledged.

39. The CS discussed with MOORE purchasing 1,000 ecstasy pills for $3,000. MOORE informed the CS that he was only able to get a piece of what the CS wanted to purchase. The CS and MOORE talked about prices and the CS reminded MOORE that AUSTIN had originally quoted the CS $3,000 for a full boat (1000 pills). MOORE informed the CS that he has to sell a full one (boat) for $4,000 to make any money. The CS advised MOORE that the CS would call him later when the CS obtained another $1,000 for the full boat of ecstasy pills.

## February 29, 2008 – Purchase of Ecstasy from AUSTIN and MOORE

40. On February 29, 2008, SPD Officer Fritts and I met with the CS in anticipation of making a controlled purchase of 1000 ecstasy pills from AUSTIN and MOORE in Stockton, California. Prior to the transaction, the CS and his/her vehicle were searched for narcotics and contraband with negative results. The CS was given a predetermined amount of U.S. currency and transmitter/recorder which allowed agents to record the subsequent conversation and transaction with AUSTIN and MOORE.

41. At approximately 6:17 P.M., the CS made an outgoing call to MOORE at 209-594-3424. The CS reached MOORE's voice mail and left a message stating that he/she had been waiting and that he/she was trying to "hook up" with him (MOORE). Approximately two minutes later, AUSTIN contacted the CS from AUSTIN's cellular telephone 702-917-8662. AUSTIN informed the CS that MOORE was over by AUSTIN's house near the mall. AUSTIN informed the CS that he/she could come over to AUSTIN's house, pick AUSTIN up, and then MOORE could drop AUSTIN off after the deal was complete.

42. At approximately 6:49 P.M., the CS contacted AUSTIN at 702-917-8662. The CS asked AUSTIN if MOORE was ready yet. AUSTIN stated that he was not.

43. Approximately three minutes later, AUSTIN contacted the CS from AUSTIN's cellular telephone 702-917-8662. AUSTIN informed the CS that she just spoke with MOORE. AUSTIN informed the CS that MOORE wanted the CS to come to AUSTIN's house, pick up AUSTIN, and then AUSTIN could bring the CS to MOORE's house in order to do the deal.

44. At approximately 7:16 P.M., the CS contacted AUSTIN at 702-917-8662. The CS asked AUSTIN if it was a bad neighborhood where they would be going to, meaning where they were going to meet MOORE. The CS then asked AUSTIN if there was a store close by MOORE's house where they could do the deal. AUSTIN informed the CS that she would ask if they could meet at the t-shirt outlet.

45. At approximately 7:18 P.M., SPD Officer Fritts and I followed the CS from a neutral location to AUSTIN's residence, 5757 Brush Creek Dr., Stockton, CA. Once the CS arrived at AUSTIN's residence, the CS called AUSTIN to inform AUSTIN that the CS had arrived at AUSTIN's residence.

46. At approximately 7:28 p.m., the CS and AUSTIN proceeded to drive away from AUSTIN's residence with AUSTIN in the front passenger seat of the CS's vehicle followed by surveillance units.

47. At approximately 7:42 P.M., the CS and AUSTIN arrived in the parking lot of a strip mall located at the north/east corner of West Lane and Hammer Lane, Stockton, CA. The CS subsequently parked in a stall near the T-shirt Outlet and SPD Officer Fritts and I continued to monitor the CS and AUSTIN.

48. At approximately 7:44 P.M., SPD Officer Fritts observed a silver 1998 Lexus, CA license #5UPB377, drive through the parking lot. The vehicle then parked in a stall near the CS's vehicle. As the Lexus arrived, AUSTIN exited the CS's vehicle, walked over to the front passenger door of the Lexus, and sat inside. Moments later, AUSTIN exited the Lexus and returned to the front passenger seat of the CS's vehicle. Once AUSTIN was back in the CS's vehicle, SPD Fritts heard the CS and AUSTIN talking about the ecstasy pills. The CS questioned AUSTIN about the white pills and AUSTIN informed the CS that the white pills were "Motorola's."

49. At approximately 7:46 P.M., AUSTIN exited the CS's vehicle and returned to the Lexus. The Lexus drove away with AUSTIN inside. At this time, SPD Officer Fritts and I followed the CS out of the area and debriefed the CS. The CS turned over a clear plastic bag containing several small tablets which appeared to be ecstasy tablets. A subsequent count of the tablets revealed 938 tablets. SPD Officer Fritts and I again searched the CS and the CS's vehicle for contraband and/or money with negative results.

50. During the debriefing, the CS stated that a few minutes after arriving in the parking lot of the T-shirt Shop, AUSTIN exited the CS's vehicle and entered MOORE's vehicle. A few minutes later, AUSTIN re-entered the CS's vehicle. The CS stated that once AUSTIN re-entered the CS's vehicle, AUSTIN pulled the suspected ecstasy pills out of her (AUSTIN's) purse and gave them to the CS. The CS stated that he/she looked at the pills and AUSTIN informed him/her that the white pills were "Motorola" pills. The CS stated that he/she then gave AUSTIN the $4000. The CS stated that he/she then thanked AUSTIN and AUSTIN exited his/her vehicle. The CS stated that AUSTIN then entered MOORE's vehicle and departed the area.

51. The DEA Western Regional Lab (WRL) later tested the pills purchased from AUSTIN and MOORE on February 29, 2008. The WRL analysis indicated that six (6) of the nine-hundred thirty-eight pills purchased from AUSTIN and MOORE contained 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy). The remaining pills contained 5-methoxy-N,Ndiisopropyltryptamine (approximately 748 pills), and ketamine (approximately 183 pills).

## March 5, 2008 – Acquisition of Suspected Ecstasy from MOORE

52. On March 5, 2008, at approximately 4:50 P.M., SPD Officer Fritts and SPD Officer Mamaril met the CS at a predetermined location in an attempt to obtain the 62 ecstasy tablets from MOORE that were not present during the meet that took place on February 29, 2008, between AUSTIN, MOORE, and the CS. Prior to the transaction, the CS and his/her vehicle were searched for narcotics and contraband with negative results. The CS was also given a transmitter/recorder which allowed SPD Officers to record the subsequent conversation and transaction with MOORE.

53. Earlier in the day, the CS contacted MOORE at 209-594-3424. The CS informed MOORE that he/she had counted the tablets purchased on February 29th, 2008 and found that the count was 62 tablets short. MOORE informed the CS that he did not believe the count was short; however, MOORE stated that he did not count the tablets himself and that his little brother did the count. MOORE informed the CS that he is a business man and would make the count right.

54. At approximately 4:55 P.M., the CS made an outgoing call to MOORE at 209-594-3424. The CS asked MOORE if he would be available to meet the CS in an hour. MOORE stated that he could not do anything until 6:30 P.M.

55. At approximately 5:43 P.M., the CS made an outgoing call to MOORE at 209-594-3424. The CS informed MOORE that he/she would meet MOORE at the same place where they met last time (West Lane and Hammer Lane, Stockton, CA).

56. At approximately 6:00 P.M., the CS was followed to the predetermined meet location and kept in view at all times. Once the CS arrived at the meet location, the CS placed another call to MOORE informing MOORE that he/she was at the meet location. MOORE informed the CS that he would be there in 10 minutes.

57. At approximately 6:28 P.M., a Silver Ford Taurus, CA license #4GVT728, arrived and parked along the driver's side of the CS's vehicle. The CS exited his/her vehicle, opened the front passenger door of the Taurus, and sat inside the vehicle. During the meet, MOORE informed the CS that he usually would not do this but he wanted to make sure he made it right so they could continue doing business. Approximately two minutes later, the CS exited the Taurus and returned to the CS's vehicle. MOORE proceeded to drive out of the parking lot followed by surveillance units.

58. At this time, SPD Officer Fritts and SPD Officer Mamaril followed the CS out of the area and debriefed the CS. At this time, the CS turned over a clear plastic bag containing 63 small tablets which appeared to be ecstasy tablets. SPD Officer Fritts and SPD Officer Mamaril again searched the CS and the CS's vehicle for contraband and/or money with negative results.

59. During the debriefing, the CS stated that MOORE arrived in a silver Ford Taurus and the CS subsequently entered MOORE's vehicle. The CS stated that as soon as he/she got into the car, MOORE handed the CS a plastic bag containing the tablets.

60. At approximately 6:33 P.M., surveillance units followed MOORE to a triplex located on Westmora Court, Stockton, CA. Moments later, SPD Sergeant Kissell advised surveillance units that MOORE was at a door of one of the units, subsequently identified as 9429 Westmora Court, Stockton, CA. SPD Sergeant Kissell left the area and did not see if MOORE entered the residence.

61. On March 6, 2008, at approximately 5:30 A.M., SPD Officer Zwicky drove by Westmora Court and observed the listed Lexus (#5UPB377) and the listed Taurus (#4GVT728) still parked in the driveway. At approximately 8:30 A.M., SPD Officer Fritts drove by the location and noticed the Lexus was no longer present but the Taurus was still parked in the driveway appearing to be in the same location.

62. The DEA Western Regional Lab (WRL) later tested the substance obtained from MOORE on March 5, 2008. The WRL analysis indicated that the sixty-three (63) pills purchased from MOORE contained 5-methoxy-N,Ndiisopropyltryptamine, a Schedule I controlled substance.

## March 7, 2008 – Purchase of Cocaine base from DIXON

63. On March 7, 2008, SPD Officer Fritts and I met with the CS in anticipation of making a controlled purchase of cocaine base from DIXON in Stockton, California. Prior to the transaction, the CS and his/her vehicle were searched for narcotics and contraband with negative results. The CS was given a predetermined amount of U.S. currency and a transmitter/recorder which allowed agents to record the subsequent conversation and transaction with DIXON.

64. Surveillance was established at 1025 Rosemarie Lane, #I7, Stockton, CA. At approximately 10:37A.M., SPD Officer Mercado observed DIXON standing next to a 1970 Mercury, CA license #2MXE629.

65. At approximately 10:39 A.M., the CS contacted DIXON at 209-423-7157. DIXON answered the phone and asked if the CS was out here already, meaning in Stockton, CA. The CS stated that he/she was. DIXON informed the CS that he had to go by his Mexican partner to pick up, meaning obtain the cocaine base. Approximately 4 minutes later, SPD Officer Mercado observed DIXON walk into Apt. #I7.

66. The CS received an incoming call from 209-430-0128. The CS did not answer the phone due to the fact that he/she was not familiar with this telephone number. At approximately 11:07 A.M., the CS contacted telephone number 209-430-0128. DIXON informed the CS that this was him (DIXON) and that he was on another phone. DIXON instructed the CS to meet him near a side street by AUSTIN's residence. The CS then asked DIXON if he knew what he/she "wanted." The CS then informed DIXON that he/she wanted "two" like last time.

67. At approximately 11:19 A.M., SPD Officer Fritts and I followed the CS from a neutral location to a side street near AUSTIN's residence, 5757 Brush Creek Dr., Stockton, CA. Once the CS arrived near AUSTIN's residence, the CS received an incoming call from DIXON. DIXON informed the CS that he was on his way.

68. At approximately 11:50 A.M., SPD Officer Mercado observed a green Chevy Astro van, CA lic#3XLT430, arrive and park near DIXON's vehicles. DIXON opened the passenger side sliding door and both he and an unidentified black male entered the van. SPD Officer Mercado could see the driver of the vehicle was a Hispanic male, later positively identified as Oscar MORENO Jr. An unidentified Hispanic male was also sitting in the front passenger seat of the Astro van. The van proceeded to drive out of the complex followed by surveillance units.

69. At approximately 12:00 P.M., surveillance units followed the Chevy Astro van directly to the meet location. As the van arrived, the van stopped directly next to the CS's vehicle. DIXON exited the van and approached the open driver's side window of CS's vehicle. At this time, DIXON and the CS completed the transaction. DIXON then got back into the Astro van and the van proceeded to drive out of the area followed by surveillance units. At this time, SPD Officer Fritts and I followed the CS out of the area and debriefed the CS. At this time, the CS turned over two clear plastic baggies containing an off-white substance suspected to be cocaine base. SPD Fritts and I again searched the CS and the CS's vehicle for contraband and/or money with negative results.

70. While debriefing the CS, the CS stated that he/she observed a green van approach his/her vehicle. The CS stated that he/she observed DIXON exit the van and approach the driver's side of the CS's vehicle. The CS stated that after DIXON approached his/her vehicle, DIXON provided the CS with the cocaine base. The CS then gave DIXON the $1300. The CS also stated that DIXON asked him/her if it was all there, meaning the money. The CS stated that he/she then observed DIXON depart the area in the green van.

71. At approximately 12:13 P.M., surveillance units followed the Astro van back to 1025 Rosemarie Lane, Stockton, CA. SPD Officer Mercado observed the van arrive back at this location and SPD Officer Mercado observed DIXON and the unidentified black male walk into Apt. #17.

72. The DEA Western Regional Lab (WRL) later tested the substance purchased from DIXON on March 7, 2008. The WRL analysis indicated that the substance purchased from DIXON was cocaine base, 59.6 % purity, with the amount of actual (pure) drug weighing 30 grams.

## May 1, 2008 – Purchase of Cocaine Base from Rafael GALVAN

73. On 4-24-08, GALVAN called the CS. GALVAN informed the CS that he was DIXON's "god brother" and that if the CS needed to purchase cocaine base that the CS should contact GALVAN directly. On 4-25-08, DIXON called the CS, informed the CS that DIXON had been "tied up" lately and that if the CS needed cocaine base, that the CS should contact GALVAN directly.

74. On 5-1-08, at approximately 2:25 p.m., Agent Ziesman-Hicks and SPD Officer Fritts met with CS at a predetermined location. Upon meeting with CS, Agent Ziesman-

Hicks searched CS while SPD Officer Fritts searched CS's vehicle. Both were found to be·clear of any illegal substance and/or money.

75. At approximately 2:47 p.m., CS placed a recorded call to Rafael GALVAN at cellular phone number (415)532-5842. Rafael GALVAN answered the call and began conversing with CS. GALVAN informed CS that he was·in the area of Fremont/99 and would be willing to meet with CS. CS and GALVAN agreed to meet in the Home Depot parking lot. GALVAN advised he would be there in 15 minutes.

76. At approximately 3:05 p.m. Agent Ziesman-Hicks equipped CS with an audio recording device and prerecorded DEA funds. Agent Ziesman-Hicks and SPD Officer then escorted CS from the neutral location to the predetermined meet location.

77. At approximately 3:14 p.m., CS arrived at the predetermined meet location. Upon CS's arrival, CS called GALVAN to inform him of CS's arrival. During the conversation, GALVAN requested CS to park near the "Taco Wagon" located in the parking lot.

78. At approximately 3:24 p.m., SPD Officer Fritts observed GALVAN arrive in the Home Depot parking lot driving the listed Black 2008 Infiniti. As GALVAN drove south bound through the lot SPD Officer Fritts was able to clearly see him through the driver's door window.

79. At approximately 3:26 p.m., GALVAN parked near CS's vehicle. Agent Ziesman-Hicks and SPD Officer Fritts watched GALVAN exit his vehicle and walk over to CS's vehicle. GALVAN entered CS's vehicle via the front passenger door. SPD Officer Fritts checked the listed Infiniti and could see a second Hispanic male 20-22years old wearing a white T-shirt sitting in the front passenger seat.

80. At approximately 3:27 p.m., while monitoring the wire, we could hear CS counting money. CS's and GALVAN proceed to talk about making more purchases.

81. At approximately 3:29 p.m., GALVAN exited CS's vehicle and returned to his vehicle. Once GALVAN got back into his vehicle, he drove away, followed by surveillance units.

82. At approximately 3:30 p.m., Agent Ziesman-Hicks received a phone call from CS advising CS purchased the requested (3) ounces of rock cocaine from GALVAN.

83. At approximately 3:31 p.m., Agent Ziesman-Hicks and SPD Officer Fritts escorted CS out of the area. We escorted CS to a predetermined location. CS was kept in view at all times. At no time did CS meet with another subject.

84. At approximately 3:36 p.m., Agent Ziesman-Hicks and SPD Officer Fritts arrived at the predetermined neutral location. Upon meeting with CS, CS turned over a knotted, clear plastic sandwich bag containing a large amount of suspected cocaine base. The substance was consistent with cocaine base and omitted an odor consistent with cocaine.

85. Agent Ziesman-Hicks searched CS while SPD Officer Fritts searched CS's vehicle. Both were clear of any illegal substance and/or money.

86. The substance seized from the CS weighed approximately 109 gross grams, including packaging and field-tested positive for cocaine.

### Information about 1025 Rosemarie Ln. #I7, Stockton, California

87. An administrative subpoena to PG & E for subscriber information for **1025 Rosemarie Ln. #I7, Stockton, California**, revealed that Rachel Pearl STALLWORTH is the listed subscriber since 2004.

### Information about 9429 Westmora Ct., Stockton, California

88. An administrative subpoena to PG & E for subscriber information for **9429 Westmora Ct., Stockton, California**, revealed that Casey METTNER is the listed subscriber since 2003.

### AUSTIN's Criminal History

89. Inquiries with the California Department of Justice (DOJ) revealed that AUSTIN has a criminal record. AUSTIN's criminal convictions includes misdemeanor PC § 242-Battery; WI § 10980 (C)(2)-Fraud/Aid; and WI § 10980 (G)(2)-Food Stamp.

### DIXONS's Criminal History

90. Inquiries with the California Department of Justice (DOJ) revealed that DIXON has a criminal record. DIXON's criminal convictions includes a felony conviction for HS 11351.5-Possession/purchase cocaine base for sale; misdemeanor PC § 148-Obstruct/Resist Public Officer; misdemeanor conviction VC § 14601.1 (A)- Drive while license suspended; and misdemeanor conviction PC § 148.9 (A)- False ID to Specific Peace Officers.

### MOORE's Criminal History

91. Inquiries with the California Department of Justice (DOJ) revealed that MOORE has a criminal record. MOORE's criminal convictions include: misdemeanor VC § 20002(A)- Hit and Run; and misdemeanor PC § 243 (E)- Battery on non-cohabitant Former Spouse.

### GALVAN'S Criminal History

92. Inquiries with the California Department of Justive revealed that GALVAN has a criminal record. GALVAN's criminal convictions include: felony conviction HS 11350 (A) –Possession of a narcotic controlled substance; felony conviction HS

11351- Possession/Purchase for sale narcotic/controlled substance; felony conviction HS 11378–Possession of controlled substance for sale.

## Probable Cause Statement for Criminal Complaints and Arrest Warrants

93. The information in this Affidavit is based upon my personal observations, the observations of other agents and officers associated with this investigation, the observations and statements of cooperating sources, and my review of official police and investigative reports. I have not included each and every fact known to me. Instead, I have included only those sufficient to demonstrate probable cause in support of the requested criminal complaints and search warrants.

94. As a result of the events described in this Affidavit, there is probable cause to believe that **Shatoya AUSTIN**, conspired to distribute and distributed at least 5 grams of cocaine base on or about January 15, 2008 and January 30, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846; and conspired to distribute and distributed 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine, on or about February 29, 2008 in violation of 21 U.S.C. § 841(a)(1) and 846.

95. As a result of the events described in this Affidavit, there is probable cause to believe that **Ralph DIXON,** conspired to distribute and distributed at least 5 grams of cocaine base on three separate occasions on or about January 15, 2008, January 30, 2008, and March 7, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846.

96. As a result of the events described in this Affidavit, there is probable cause to believe that **Donald MOORE**, conspired to distribute and distributed 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy), 5-methoxy-N,Ndiisopropyltryptamine, and ketamine, on or about February 29, 2008, and of 5-methoxy-N,Ndiisopropyltryptamine on or about March 5, 2008, in violation of 21 U.S.C. § 841(a)(1) and 846.

97. As a result of the events, described in this Affidavit, there is probable cause to believe that **Rafael GALVAN,** concpired to distribute and distributed at least 5 grams of cocaine base on or about May1, 2008, in violation of 21 U.S.C. 841(a)(1) and 846.

98. Therefore, your affiant respectfully requests that this Court issue criminal complaints and arrest warrants against **Shatoya AUSTIN, Ralph DIXON, Donald MOORE,** Rafael **GALVAN** for the violations listed above.

## Probable Cause Statement for Search Warrants

99. Based upon my training and experience, I have learned the following:

   a. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records

tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

b.  Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically, traffickers keep records of those registrations and transactions in their residences.

c.  I have learned that large-scale drug traffickers often have on-hand large amounts of United States currency in order to maintain and finance their ongoing business. I have also learned that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residences or in the areas under their control.

d.  I have learned that traffickers commonly have in their possession, that is on their person, in their vehicles, at their residences, and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used to protect and secure a trafficker's property which may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

e.  I have learned that traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, narcotics, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

f.  I have learned that drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their criminal associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

g. I have learned that large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

h. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances. I have also learned that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other then themselves in an effort to avoid detection by law enforcement.

i. In my experience, drug traffickers often utilize telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business.

j. In addition, I have also learned that these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

k. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances as well as the proceeds from such illegal operations.

100. In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that evidence of **Ralph DIXON's** cocaine base distribution and conspiracy to distribute cocaine base, including contraband, fruits of the crimes, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, is located at **1025 Rosemarie Ln. #I7, Stockton, California,** further described in **Attachment A-1,** incorporated herein, the person of **Ralph DIXON,** and **one silver-colored 2000 Chevrolet Cavalier, CA license #4KAX727; and one yellow 1970 Mercury Cougar, CA license plate # 2MXE629.**

101. In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that evidence of **Donald MOORE's** 3,4-methylenedioxy-methamphetamine (MDMA otherwise known as Ecstasy) distribution and conspiracy to distribute 3,4-methylenedioxy-methamphetamine, including contraband, fruits of the crimes, and other items illegally possessed, property designed for use, intended for use, or used in

committing a crime, is located at **9429 Westmora Ct., Stockton, California,** further described in **Attachment A-2,** incorporated herein, the person of **Donald MOORE,** and **one silver-colored 1998 Lexus, CA license #5UPB377; and one silver 2000 Ford Taurus, CA license #4GVT728.**

102.    I believe there is probable cause that at these locations and on these premises will be found evidence, instrumentalities, and the fruits of violations of Title 21, United States Code, Section 841(a)(1), to wit, conspiracy to distribute and distribution of controlled substances.

103.    It is my belief that those items listed on Attachment B, fully incorporated into this affidavit by reference, may be found at the premises to be searched, as also described in Attachments A-1 and A-2, fully incorporated herein by reference. I base this belief on the information set forth herein, my training and experience, and the experience of the law enforcement officers with whom I have consulted.

I swear under the penalty of perjury that the foregoing information is true and correct to the best of my knowledge information and belief.

Brittany E. Ziesman-Hicks, Special Agent    5-2-08
Drug Enforcement Administration

Sworn to and subscribed before
me this 2nd day of May 2008.

GREGORY G. HOLLOWS

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Heiko P. Coppola
Assistant U.S. Attorney

## **ATTACHMENT A-1: LOCATIONS TO BE SEARCHED**

1. 1025 Rosemarie Lane, Apartment #I7, Stockton, California, further described as an apartment located within a two-story multi structure complex. Each structure is designated by a corresponding letter with each apartment within that structure being designated a number. The complex is brown with white trim. The address for the complex is located on a large rectangular metal placard with the name "Pacific Pointe" that is affixed to a large concrete fixture. Apartment #I7 is located in the Northeast corner of the complex in structure "I". Structure "I" consists of two separate buildings with a stair well/landing connecting the two buildings. Apartment #I7 is located in the western building that contains apartments #I5-8 with two apartments on the first floor and two apartments on the second floor. Apartment #I7 is located on the first floor on the southern half of the building. The front door to Apartment #I7 is white, compared to the other three doors which are all green.

2. The person of Ralph DIXON, black male adult, date of birth 7-20-1977, 5'11" tall, approximately 160 pounds, brown eyes, brown hair, California drivers license number B6393042.

3. A silver-colored Chevrolet Cavalier, bearing license plate #4KAX727, and a yellow Mercury Cougar, bearing license plate #2MXE629.

## ATTACHMENT A-2: LOCATIONS TO BE SEARCHED

1. 9429 Westmora Court, Stockton, California, further described as a residence contained within a single story tri-plex. The tri-plex consists of (9429), (9431) and (9433). The tri-plex is constructed of wood and stucco which is tan with green trim. 9429 is located at the southwest corner of the tri-plex with the front door to the residence facing east. The numbers 9429 are tan and attached to the front door of the residence, as well as along the southwest corner of the detached garage.

2. The person of Donald MOORE, black male adult, date of birth 6-17-1977, 5'7" tall, approximately 170 pounds, brown eyes, black hair, California drivers license number B6026950.

3. A silver Lexus, bearing license plate #5UPB377, and a silver Ford Taurus, bearing license plate #4GVT728.

## ATTACHMENT B

ITEMS TO BE SEIZED:

1. Items associated with the processing of controlled substances for transportation and distribution, such as measuring instruments and scales, compression devices, glass or plastic bags and packaging material;

2. Paraphernalia commonly associated with the manufacture and packaging for sale or the transportation of controlled substances, to include cutting agents and dilutents, chemical testing devices, packaging materials or plastic bags and paper bindles, triple beam scales and other weighing devices, measuring devices, detached mirrors, sieves, strainers, boxes, chests, coolers;

3. Indicia of possession of the place to be searched, including articles of personal property, such as personal identification, personal correspondence, delivery pouches, diaries, checkbooks, bank account records, addressed envelopes, vehicle registrations, exposed film, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

4. Items and documents tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes, and safety deposit boxes;

5. Firearms and ammunition;

6. Documents related to the use of domestic and/or international shipment services which may have been used to ship controlled substances or to conceal the shipment of controlled substances or currency;

7. Documents related to the purchase and rental of vehicles which may have been used to transport controlled substances;

8. Documents related to controlled substance transactions, including personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, e-mail address, fax numbers and/or telex numbers, pay-owe sheets, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial or criminal association exists;

9. Electronic communication devices including telephones, paging devices, PDA's (personal data assistants), palm pilots, text messaging devices, together with the information stored therein which may identify co-conspirators, instructions, receipts for these items;

10. Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

11. Tickets, itineraries, receipts, reservation confirmations, maps and other items relating to domestic and international travel or co-conspirators;

12. Items used in the packaging of currency for consolidation and transportation, such as large quantities of rubber bands, currency wrappers or bands, duct or wrapping tape, and plastic sealing machines;

13. Items and documents tending to establish the purchase and sale of controlled substances, to include buyer's lists, seller's lists, ledgers of transactions, codes, pay-owe sheets, any of these items stored in electronic mediums, (e.g. computers, floppy discs, memory calculators), telephonic pagers and cellular telephones, telephone billing records, credit card statements, wire transfer records, travel documents, telephone/address books, calendars containing notations, diaries and photographs and videos of controlled substances, currency locations, or associates;

14. The following items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money: books, records, invoices, receipts, records of real estate or securities transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, work papers, escrow files, Forms 1099, wire transfer records;

15. Items tending to establish substantial income from narcotics trafficking, to include currency in excess of $1,000, money orders, cashier's checks, certified checks, travelers checks, bonds, stock certificates, vehicles, gold, silver, jewels, electronic equipment, negotiable securities, certificates of deposit, documents evidencing the purchase of expensive (in excess of $2,000) assets, real property, bank statements, canceled checks, credit card statements, state and Federal income tax returns, business records, which includes general ledgers, general journals, cash receipts and disbursement journals, sales journals or other books of account, records and keys for safety deposit boxes, receipts, and other items evidencing the obtaining, secreting transfer, concealment and expenditures of large sums of currency;

16. Items tending to establish evidence of money laundering activity to include records of currency transactions, foreign and domestic, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering